Slip Op. 12-144

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **SAMSUNG INTERNATIONAL, INC.,** | |
| Plaintiff, | |
| v. | **Before: Jane A. Restani, Judge** |
| **UNITED STATES,** | **Court No. 10-00015** |
| Defendant. | Public Version |

[Plaintiff's motion for summary judgment in classification case denied.  Defendant's cross-motion for summary judgment granted.]

### OPINION

Dated:  November 21, 2012

Felicia L. Nowels, Akerman Senterfitt, of Tallahassee, FL, argued for plaintiff.

Marcella Powell, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, argued for defendant.  With her on the brief were Stuart F. Delery, Acting Assistant Attorney General, and Barbara S. Williams, Attorney in Charge.  Of counsel on the brief was Paula Smith, Office of Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection.

Restani, Judge:  This matter is before the court on cross-motions for summary

judgment by Plaintiff Samsung International, Inc. ("Samsung") and Defendant United States

("the Government") pursuant to USCIT Rule 56.  Samsung challenges the U.S. Bureau of

Customs and Border Protection's ("Customs") liquidation of certain entries and its denial of

Samsung's protests relating to the classification of plasma televisions and video monitors.[1]  Pl.'s

Mot. and Mem. in Supp. for Summ. J. ("Pl.'s Br.") 1.  Samsung argues its imported plasma

televisions and video monitors are eligible for preferential duty free treatment under the North

American Free Trade Agreement ("NAFTA").  Id.  This issue turns on the classification of

Samsung's Plasma Display Panel Module ("PDP Module"), which is manufactured in Korea and

is a component of the imported televisions and video monitors.  For the reasons below, the court

denies Samsung's motion for summary judgment and grants the Government's cross-motion for

summary judgment.

## FACTS

The parties do not dispute the following facts related to the procedural

background of this case.  Samsung imported flat panel plasma televisions and video monitors

("the imported goods") into the United States from Mexico between December 2004 and June

2005 under subheading 8528.12.72, Harmonized Tariff Schedule of the United States

("HTSUS"), and 8528.21.70, HTSUS, respectively.[2]  Pl.'s Br. 2; Statement of Undisputed

Material Facts ("Pl.'s Facts") ¶ 1; Def.'s Resp. ¶ 1.  The imported goods contained either a V3 or

---

[1]  Samsung challenges the deemed denial of Protest Numbers 2506-06-100070, 2506-06-100030 and 2506-06-100010.  Def.'s Resp. to Pl.'s Statement of Undisputed Material Facts ("Def.'s Resp.") ¶ 6.  These protests cover ten different entries: 583-2168979-4, 583-0146277-4, 583-2166642-0, 583-2166835-0, 583-2168144-5, 583-2167288-1, 583-2166681-8, 583-2165690-0, 583-2165857-5, and 583-2165862-5.  Pl.'s Br. 2 n.3.

The summons in this case originally listed additional entries.  These entries have been severed from this action and transferred to Court No. 11-00019.  Order of Jan. 28, 2011, Docket No. 11-00019.

[2]  Citations herein are to the 2004 HTSUS.  The 2005 HTSUS does not differ in any material respect.

V4 version of the PDP Module.  Pl.'s Facts ¶ 14; Def.'s Resp. ¶ 14.

       Samsung timely filed a request for NAFTA post-importation duty refunds on the imported goods.  Pl.'s Facts ¶ 3; Def.'s Resp. ¶ 3.  Customs denied the request based on two prior Customs rulings: NY K83248 and NY K83886.  Pl.'s Facts ¶ 4; Def.'s Resp. ¶ 4.  These rulings had classified plasma screens combined with various electronic assemblies as "flat panel screen assemblies" ("FPSAs") under HTSUS 8529.90.53.  See NY K83248 (Feb. 20, 2004), Pl.'s Ex. 21 at 8 (classifying as a FPSA a glass plasma screen combined with an "address assembly, the scan A & B assemblies and various connector assemblies"); NY K83886 (Mar. 9, 2004), Pl.'s Ex. 21 at 9 (classifying as a FPSA a glass plasma screen combined with "electronic assemblies and various connector assemblies").  Customs found that Samsung's PDP Modules were FPSAs because they consisted of a glass plasma screen combined with various electronics assemblies.  Def.'s Resp. to Pl.'s First Interrog., Def.'s Ex. X at ¶ 7.  Because the applicable NAFTA Rules of Origin did not accord NAFTA preferential treatment to televisions and video monitors that incorporated FPSAs originating from non-NAFTA countries, Customs concluded that Samsung's imported goods, which incorporated the Korean-made FPSAs, were not entitled to NAFTA preferential treatment and denied Samsung's duty refund request.  Id. ¶ 8; see also Pl.'s Facts ¶ 4; Def.'s Resp. ¶ 4.

       Samsung timely filed protests and applications for further review of the denial of its requested NAFTA refunds, arguing that the incorporated PDP Modules did not constitute FPSAs of HTSUS 8529.90.53.  Pl.'s Facts ¶ 6; Def.'s Resp. ¶ 6.  Customs did not issue a denial of Samsung's protests and applications for further review.  Pl.'s Facts ¶ 7; Def.'s Resp. ¶ 7.  In November 2009, Samsung timely filed a request for accelerated disposition.  Pl.'s Facts ¶ 8;

Def.'s Resp. ¶ 8.  Commerce did not respond to the request for accelerated disposition and the

protests were deemed denied under 19 U.S.C. § 1515(b) and 19 C.F.R. § 174.22(d).  Pl.'s Facts

¶ 9; Def.'s Resp. ¶ 9.

        In August 2004, prior to Samsung's importation of the imported products, a

NAFTA Customs subgroup issued a definition of "flat panel screen assemblies."  Pl.'s Facts

¶¶ 65–66; Def.'s Resp. ¶¶ 65–66.  The NAFTA subgroup stated that "[f]or purposes of tariff item

8529.90.ee, the phrase 'flat panel screen assemblies' means an assembly consisting of at least

drive electronics, control electronics and a display device, other than LCD technologies."

NAFTA Customs Subgroup, Clarification of TV technologies: Flat panel screen assemblies

(Aug. 4, 2004) ("NAFTA Clarification"), Def.'s Ex. A at 3; see Pl.'s Facts ¶ 67; Def.'s Resp.

¶ 67.  The NAFTA Clarification also stated that "[i]f at least one of the components of the

definition of 'flat panel screen assemblies' is not incorporated, such assembly shall not be

classifiable within tariff item 8529.90.ee."  NAFTA Clarification at 3 n.2.  The NAFTA

subgroup did not define control electronics, drive electronics, or display device.  Id.; see Pl.'s

Facts ¶ 68; Def.'s Resp. ¶ 68.  In October 2006, after the goods were imported and NAFTA

treatment denied, but before the protests were deemed denied, Customs issued the Pioneer

Revocation Ruling, HQ W967693 (Oct. 12, 2006) ("Pioneer Ruling"), Def.'s Ex. E; Pl.'s Facts

¶ 71; Def.'s Resp. ¶ 71.[3]

───────────────

[3] The Pioneer Ruling revoked the two prior rulings cited by Customs to deny Samsung's
request for NAFTA preferential treatment.  Def.'s Ex. E at 1.  The Pioneer Ruling adopted the
NAFTA Clarification's definition of a FPSA.  Id. at 4–5.  After a notice and comment period and
after consulting dictionary definitions, Customs developed definitions of control and drive
electronics.  Id. at 5–8.  Customs concluded the plasma display module at issue, which did not

(continued...)

The parties do not dispute the following facts related to the components and function of the PDP Modules. Both the V3 and V4 versions of the PDP Module were manufactured in Korea. Pl.'s Facts ¶ 13; Def.'s Resp. ¶ 13; Def.'s Statement of Undisputed Facts ("Def.'s Facts") ¶ 3; Pl.'s Resp. to Def.'s Statement of Undisputed Facts ("Pl.'s Resp.") ¶ 3. The V3 PDP Module consisted of glass panels, a X Driver, a Y Driver, a Column Driver, a Logic Board, Logic Buffers, a chassis, and a power supply. Pl.'s Facts ¶ 46; Def.'s Resp. ¶ 46. The glass panels contained plasma glass, X electrodes, Y electrodes, and Column electrodes.[4] Pl.'s Facts ¶ 48; Def.'s Resp. ¶ 48. The V4 Module contained the same components, but its Logic Board was not attached to the Module at the time of importation. Pl.'s Facts ¶¶ 43–44; Def.'s Resp. ¶¶ 43–44. The Logic Board of the V3 PDP Module[5] contained several integrated circuits, including a Sequence Processor, Data Processor, Data Distributor, read only memory processors, and a Decoder. Def.'s Facts ¶ 8; Pl.'s Resp. ¶ 8. Once in Mexico, the PDP Modules were combined with a Main Board, which was manufactured in Mexico, front and rear covers, cables, and various connectors, fasteners, and other parts to produce the finished video monitors and televisions. Pl.'s Facts ¶¶ 18, 31; Def.'s Resp. ¶¶ 18, 31.

The Main Board receives signals, in various formats from an outside source, such as a DVD player or a cable box, processes all of these signals, and converts the signals into a

---

[3](...continued)
contain a logic board, was not a FPSA because it lacked control electronics. Id. at 8.

[4] When the electrodes are energized by an electrical signal, they activate the plasma gas and illuminate a pixel, which produces an image on the screen. Pl.'s Facts ¶¶ 47–48; Def.'s Resp. ¶¶ 47–48.

[5] The Logic Board of the V4 Module is not further described in the undisputed facts of either party.

Low Voltage Differential Signal ("LVDS").  See Pl.'s Facts ¶ 38; Def.'s Resp. ¶ 38.  The LVDS

signal is a compressed image data signal composed of synchronization signals (V-sync and H-

sync signals)[6] and raw image data signals, which include "Red Green Blue" information.  Pl.'s

Facts ¶¶ 28, 39; Def.'s Resp. ¶¶ 28, 39.  The Main Board sends the data in LVDS format to the

Logic Board, which is located on the PDP Module.  Pl.'s Facts ¶¶ 38–39; Def.'s Resp. ¶¶ 38–39.

      Because the Drivers on the PDP Module cannot understand a LVDS signal, the

Logic Board's Decoder takes the LVDS signal from the Main Board and converts it into a format

that the Drivers can understand.  Def.'s Facts ¶¶ 15, 16; Pl.'s Resp. ¶¶ 15, 16.  The Decoder then

sends the video information and instructions to the Logic Board's Sequence Processor.[7]  Def.'s

Facts ¶ 17; Pl.'s Resp. ¶ 17.  The Sequence Processor converts the sync signals into timing

information.  Def.'s Facts ¶ 19; Pl.'s Resp. ¶ 19.  The Sequence Processor then takes the video

information and instructions from the Decoder and converts those instructions in accordance

with the timing information derived from the sync signal.  Def.'s Facts ¶ 18; Pl.'s Resp. ¶ 18.

The signal is then sent to the Data Processor, which performs part of the "subfield pattern"

process.[8]  Def.'s Facts ¶ 28; Pl.'s Facts ¶ 25.  Finally, the signal is sent to the Data Distributor.

_____

[6] The sync signals dictate the synchronization of the display, meaning when the display
starts and ends a frame.  Pl.'s Facts ¶ 40; Def.'s Resp. ¶ 40.

[7] Samsung argues this video information is not a "video" signal and instead is an
electrical signal.  Pl.'s Facts ¶ 29.  Samsung does not dispute that a LVDS signal is a
"compressed image data signal" that contains raw image data.  Pl.'s Facts ¶ 28.  The label of the
signal is not material.

[8] The Data Processor receives the video information and divides each frame into sub-
fields.  Def.'s Facts ¶ 28.  Each sub-field has a different level of brightness from total black to
total white.  Id. ¶ 23.  Each sub-field is divided into an addressing period, a sustaining period,
and a reset period.  Id. ¶ 21.  First, in the addressing period, a voltage pulse is sent to the

      (continued...)

Def.'s Facts ¶ 29; Pl.'s Resp. ¶ 29.  The Data Distributor stores the data in its memory and routes

the data to the appropriate Driver.  See Def.'s Facts ¶¶ 30–31.  This ends the functions of the

Logic Board.  The Drivers take the information from the Logic Board and "make and deliver

driving waveforms [i.e. electrical pulses]," that are sent to the respective electrodes (i.e. the X

Driver sends a waveform to the X electrodes), thereby illuminating the pixels and plasma gas to

create an image.  Pl.'s Facts ¶ 60; Def.'s Resp. ¶ 60.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over the denial of a timely protest under 28 U.S.C.

§ 1581(a).  The proper classification of imported merchandise involves a two step analysis: (1)

ascertaining the proper meaning of specific terms in the tariff provision, which is a question of

law; and (2) determining whether the merchandise at issue comes within the description of such

terms as properly construed, which is a question of fact.  Cummins Inc. v. United States, 454

F.3d 1361, 1363 (Fed. Cir. 2006).  Both questions are decided de novo.  28 U.S.C. § 2640(a)(1).

Summary judgment is appropriate if there is "no genuine issue as to any material

fact" and "the movant is entitled to judgment as a matter of law."  USCIT R. 56(c).  A

classification case is ripe for summary judgment when there is no genuine dispute as to the

underlying factual issue of exactly what the merchandise is.  Bausch & Lomb, Inc. v. United

States, 148 F.3d 1363, 1365 (Fed. Cir. 1998).

---

[8](...continued)
electrodes on the panel corresponding to the relevant sub-field.  Id. ¶ 25.  Second, the sustaining
period provides the voltages that cause the pixel to emit light.  Id. ¶ 26.  How long the sustaining
period lasts determines how brightly the pixel will glow, from total black to total white.  Id. ¶ 23,
26.  Third, the reset period clears up the residual charge from the previous frame.  Id. ¶ 24.
Plaintiff does not dispute these facts but argues they are irrelevant.  Pl.'s Resp. ¶¶ 20–31.

## DISCUSSION

The issue in this case is whether Samsung's PDP Modules are classified as "flat panel screen assemblies" ("FPSA") under 8529.90.53, HTSUS.  If the PDP Modules are FPSAs, then the PDP Modules are not eligible for a "tariff shift" pursuant to the NAFTA Rules of Origin ("ROO"), as outlined below, and as a result, the imported goods are not eligible for NAFTA preferential treatment.  If the PDP Modules are not FPSAs, then the tariff shift rule is satisfied, and the imported goods are considered products originating from a NAFTA territory and are entitled to NAFTA preferential treatment.

Under the NAFTA ROO, incorporated into HTSUS General Note 12, only "[g]oods originating in the territory of a party to [NAFTA]" are eligible for NAFTA preferential treatment.  General Note 12(a).  When a product is produced in a NAFTA country using materials or parts obtained from countries outside of NAFTA, the non-NAFTA originating part must be "transformed" in the NAFTA territory "so that . . . each of the non-originating materials used in the production of such goods undergoes a change in tariff classification" as described in the ROO.  General Note 12(b)(ii)(A).[9]  This change in the tariff classification of the non-originating material is known as a "tariff shift."[10]

---

[9] General Note 12(b)(ii)(A) states: "Goods originating in the territory of a NAFTA party" include goods that "have been transformed in the territory of Canada, Mexico and/or the United States so that . . . each of the non-originating materials used in the production of such goods undergoes a change in tariff classification described in subdivisions (r), (s) and (t) of this note or the rules set forth therein . . . .".

[10] In determining whether a foreign material has undergone the requisite tariff shift, Customs first determines the tariff classifications for both the non-NAFTA material and the finished article.  See Bestfoods v. United States, 110 F. Supp. 2d 965, 970 n.4, 24 CIT 552, 557

(continued...)

Here, the applicable NAFTA ROO prohibit a tariff shift from a FPSA to a video monitor or television reception apparatus. General Note 12(t), Chapter 85, No. 90, 92H.[11] In other words, a video monitor or television reception apparatus does not receive NAFTA preferential treatment if it was made using a FPSA produced in a non-NAFTA country.

## II. HTSUS 8529.90.53

### A. Heading 8529

Samsung and the Defendant agree that the subheading must be interpreted in light of its heading. Pl.'s Mem. in Opp'n to Def.'s Cross-Mot. for Summ. J. and in Reply to Def.'s Opp'n to Pl.'s Mot. for Summ. J ("Pl.'s Reply") 8–9; Mem in Supp. of Def.'s Cross Mot. for Summ. J. and in Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Br.") 12–13.[12]

---

[10](...continued)
n.4 (2000) (reversed on other grounds by 260 F.3d 1320 (Fed. Cir. 2001)). In this case, it is undisputed that the finished articles, Samsung's imported televisions and video monitors, were properly classified under subheading 8528.12.72, HTSUS (televisions) and 8528.21.70, HTSUS, (video monitors). Pl.'s Facts ¶ 1; Def.'s Resp. ¶ 1. Thus, the determination of whether the tariff shift has occurred depends on the classification of the non-NAFTA material, Samsung's PDP Modules.

[11] General Note 12(t), Chapter 85, No. 90 defines the applicable tariff shift rule as: "A change to tariff items 8528.12.62, 8528.12.64, 8528.12.68 or 8528.12.72 [television reception apparatus] from tariff items 8528.12.04 or 8528.12.08 or any other heading, except from tariff item 8529.90.53."
General Note 12(t), Chapter 85, No. 92H defines the applicable tariff shift rule as: "A change to tariff items 8528.21.55, 8528.21.60, 8528.21.65 or 8528.21.70 [video monitor] from tariff items 8528.12.05 or 8528.12.10 or any other heading, except from tariff item 8529.90.53."
These ROO mean that if a component part produced outside of NAFTA that would be classified under any tariff item, except for 8529.90.53, enters into Mexico and is transformed into a finished product that is classified under the listed tariff items, including 8529.12.72 and 8528.21.70, then the finished product is a NAFTA originating item and is eligible for NAFTA preferential treatment, regardless of its inclusion of a non-NAFTA component.

[12] With its Reply, Plaintiff filed a Response Statement of Facts to Def.'s Reply to Pl.'s
(continued...)

The proper interpretation of a tariff item begins with the "terms of the heading." General Rules of Interpretation ("GRI") 1.  Heading 8529 refers to: "Parts suitable for use solely or principally with the apparatus of headings 8525 to 8528."  Headings 8528 includes, inter alia, video monitors and television reception apparatus, which are the relevant products here.  8528, HTSUS.[13]  Thus, in order to be classified in 8529, the item must be a part used solely or principally with some other apparatus of headings 8525 to 8528, including video monitors and television reception apparatus.

Heading 8529 applies only to "parts" used with articles classified in headings 8525 through 8528.[14]  A part is distinguished from a finished product and from an unfinished product that possesses the essential character of the finished product.  See GRI 2(a) (stating that unfinished products possessing the essential character of a finished product are to be classified in the heading of the finished product).  Thus, the proper construction of the term FPSA does not encompass a product that possess the essential character of a finished television or video monitor.

**B.      Subheading 8529.90.53**

Samsung argues the proper classification of its PDP Modules is 8529.90.89

---

[12](...continued)
Statement of Undisputed Facts.  This is not a filing permitted by USCIT Rule 56 and the court did not rely on it.

[13]  Heading 8528 applies to: "Reception apparatus for television, whether or not incorporating radiobroadcast receivers or sound or video recording or reproducing apparatus; video monitors and video projectors".

[14]  A "part" is "an essential element or constituent; integral portion which can be separated, replaced, etc."  Rollerblade, Inc. v. United States, 282 F.3d 1349, 1353 (Fed. Cir. 2002) (citing Webster's New World Dictionary 984 (3d College ed. 1988)).

(Other; Of television receivers; Other).[15]  Defendant argues that Customs properly classified the

PDP Modules as FPSAs of 8529.90.53 (Flat panel screen assemblies . . .).[16]  Because Samsung's

proposed subheading is an "Other" category, the court will first consider the proper construction

of 8529.90.53.

        Samsung argues that the proper construction of subheading 8529.90.53 is

reflected in the NAFTA Clarification.  Pl.'s Reply 7.  Defendant argues that the proper

construction of the subheading can be determined exclusively by the plain language of the

---

[15]  The subheadings of 8529.90 are:

Printed Circuit assemblies

Transceiver assemblies for the apparatus of subheading 8526.10, other than printed
circuit assemblies

Parts of television receivers specified in additional U.S. note 10 to this chapter, other than
printed circuit assemblies

Combinations of parts specified in additional U.S. note 10 to this chapter

Flat panel screen assemblies for the apparatus of subheadings 8528.12.62 . . .

Other, parts of printed circuit assemblies, including face plates and lock latches

Other parts of articles of heading 8525 and 8527, except parts of cellular telephones

Other
        Of television receivers; . . .
                Other - 8529.90.89
        Other - 8529.90.99

[16]  Defendant argues that if the PDP Modules are not FPSAs of 8529.90.53, the proper
classification is 8529.90.99 (Other; Other).  Because the court concludes that the PDP Modules
are FPSAs, the court does not reach Defendant's alternative argument.

heading or, in the alternative, with reference to the NAFTA Clarification. Def.'s Br. 13–16.[17]

Subheading 8529.90.53 applies to "Flat panel screen assemblies for the apparatus of subheadings 8528.12.62, 8528.12.64, 8528.12.68, 8528.12.72, 8528.21.55, 8528.21.60, 8528.21.65, 8528.21.70, 8528.30.62, 8528.30.64, 8528.30.66 and 8528.30.68." The listed subheadings apply to various types of color plasma video monitors, television reception apparatus, and video projectors. The term "flat panel screen assemblies" is not defined in the HTSUS section notes, chapter notes, or in the HTS Explanatory Notes.

When the HTSUS and its legislative history do not define a tariff term, the correct meaning is the common meaning. Rocknel Fastener, Inc. v. United States, 267 F.3d 1354, 1356 (Fed. Cir. 2001). "The common meaning of a term used in commerce is presumed to be the same as its commercial meaning." Id. at 1356 (citing Simod Am. Corp. v. United States, 872 F.2d 1572, 1576 (Fed. Cir. 1989)). "To ascertain the common meaning of a term, a court may consult 'dictionaries, scientific authorities, and other reliable information sources' and 'lexicographic and other materials.'" Id. at 1356–57 (citing Simod, 872 F.2d at 1576).

Instead of dictionary definitions, both parties put forth a definition of FPSA developed by a NAFTA subgroup, referred to here as the NAFTA Clarification. The NAFTA

---

[17] Defendant argues that the plain language of the heading is sufficient to establish the meaning of FPSA. An "assembly" refers to more than one item that is designed to be assembled together. Webster's Third New International Dictionary of the English Language Unabridged (1981) ("assembly: a collection of parts so assembled as to form a complete machine, structure, or unit of a machine"). The plain meaning of the term FPSA therefore refers to multiple parts that may be assembled together to create something else. Obviously, a flat panel screen is included. It cannot be determined, based on the plain language alone, what additional parts must be included with the flat panel screen in order to constitute a FPSA. Further, because the Pioneer Ruling rejected this approach, the court will not address it, and the court need not address it to resolve this matter.

Clarification stated, "[f]or purposes of tariff item 8529.90.ee, the phrase 'flat panel screen

assemblies' means an assembly consisting of at least drive electronics, control electronics and a

display device, other than LCD technologies." Def.'s Ex. A at 3. Additionally, "[i]f at least one

of the components of the definition . . . is not incorporated, such assembly shall not be

classifiable within tariff item 8529.90.ee." Id. at 3 n.2.

        Although not controlling, the court concludes that the NAFTA Clarification is a

reliable source that can assist the court in ascertaining the common meaning of FPSA. See

Rocknel Fastener, 267 F.3d at 1357 (stating that the court may consult "other reliable

information sources" when determining common meaning). The NAFTA Clarification is

consistent with the terms of the subheading in that it refers to a collection of parts that can be

combined with a flat panel screen. The experts who addressed the issue of whether the NAFTA

definition reflects the common meaning of FPSA in the plasma industry stated that the NAFTA

definition reflects the industry understanding of FPSAs. See Declaration of Elliott Schlam

("Schlam Declaration"), Def.'s Ex. B at ¶ 12 ("When the NAFTA Customs Subgroup defined

'Flat Panel Screen Assemblies,' it referred to the display device, the driver electronics and the

control electronics. As discussed above it was clearly referring to the terminology used by the

entire display industry.").[18]

--------

[18] In determining the proper meaning of a tariff heading, the court considers expert
opinions, not as fact witnesses, but as experts on the common meaning or understanding of a
term in a particular industry. See Kahrs Int'l, Inc. v. United States, 791 F. Supp. 2d 1228,
1240–41 (CIT 2011). Expert opinions are merely advisory, however, and are given weight only
to the extent that they are consistent with lexigraphic and other reliable sources. Id. Samsung's
experts do not address whether the NAFTA definition is appropriate or consistent with the
common or commercial meaning. See, e.g., Jin Ho Yang Report ("Yang Report"), Pl.'s Ex. 7.
(continued...)

The NAFTA Clarification, however, did not define "drive electronics, control electronics and a display device." Thus, the court must determine the common meaning of these terms before it can define FPSA.

###### 1.    Drive Electronics

Samsung argues that drive electronics "drive an object, by sometimes needing to reformat the data, to power and control another circuit by providing input to the other circuit . . . ." Pl.'s Br. 22. Samsung argues that the distinguishing characteristic between drive and control electronics is that drive electronics have "no independent intelligence" and cannot "alter the instructions contained in the signal" but instead "do what they are told." Pl.'s Br. 22. Defendant argues the court should extend Skidmore[19] deference to Custom's definition of drive electronics set forth in the Pioneer Ruling. Def.'s Br. 16–20. The Pioneer Ruling defined drive

---

[18](...continued)
Samsung argues that disregarding the NAFTA Clarification would be detrimental to NAFTA relations and would result in the inconsistent application of the ROO among the NAFTA parties. Pl.'s Reply 26–27. Thus, Samsung seems to agree that the court should accept the NAFTA Clarification as the common definition of FPSAs.

[19] The court extends Skidmore deference to Customs rulings only to the extent that the ruling has the power to persuade. See Warner-Lambert Co. v. United States, 407 F.3d 1207, 1209 (Fed. Cir. 2005) (citing Skidmore v. Swift & Co., 323 U.S. 134 (1944)). Consistent with the court's independent responsibility to decide legal issues, including the proper meaning of a tariff term, the court does not adopt the Pioneer Ruling's definitions of drive and control electronics in toto. See Rocknel Fastener, 267 F.3d at 1357–58 (noting that the court has an independent responsibility to interpret tariff terms). The Pioneer Ruling did not attempt to classify a logic board, which is the determinative issue here. In conducting its own analysis, the court considers the Pioneer Ruling's definitions to some extent because Customs, after a notice and comment period, determined a common definition of drive and control electronics in the context of a FPSA as opposed to a complete television. See Rubie's Costume Co. v. United States, 337 F.3d 1350, 1356 (Fed. Cir. 2003) (noting that the notice and comment process is a factor in determining the quality of Custom's reasoning).

electronics as electronics that take information from the control electronics and "energize and

de-energize the appropriate cell on the display in order to create an image." Pioneer Ruling 5.

The parties provide the following dictionary definitions of "drive" as evidence of

the common meaning of drive electronics:[20]

> Alan Freedman's Computer Glossary (9th ed.), Pl.'s Ex. 20
> drive 2: to provide power and signals to a device

> The IEEE Standard Dictionary of Electrical and Electronics Terms (6th ed.), Pl.'s Ex. 20
> drive 1: the equipment used for converting available power into mechanical power suitable for the operation of a machine

> The Random House Dictionary of the English Language, Def.'s Ex. T
> drive 35 (electronics): excitation
>
> drive 2: to force to work or act

> Funk & Wagnalls Standard College Dictionary, Def.'s Ex. U
> drive 9: to provide the motive power for and cause to operate; make function
>
> drive 11 (mechanical): a means of transmitting power, as from the motor of an automobile to the wheels

---

[20] Samsung attempts to establish a common definition of "drive electronics" by referencing prior Customs rulings relating to LCD televisions. Pl.'s Br. 19–21. Based on these prior rulings, Samsung argues that Custom's and the industry's longstanding definition of drive electronics included circuits that "process, convert, and synchronize signals to generate an image on the screen." Id. at 20. These prior Customs rulings did not attempt to discern a common definition of drive electronics and the definition of drive or driver electronics was not at issue in any of these cases. These rulings merely describe the product at issue in an attempt to determine whether the products were dedicated for a particular use. See, e.g., HQ 952360 (Oct. 15, 1992), Pl.'s Ex. 21 at 3 (finding the LCD panel at issue was not classifiable in 8529 and instead was classified as a LCD under 9013); NY 881846 (Jan. 15, 1993), Pl.'s Ex. 21 at 9 (describing a LCD viewfinder for a camcorder as including an integrated circuit designed for "driving" the display). Moreover, even assuming Customs developed a common definition for drive electronics for LCD televisions, which Samsung has not shown to be the case, Samsung has not indicated why it would be proper to apply definitions developed by Customs for entirely different HTSUS headings and products. Accordingly, the court does not find the Customs rulings related to LCD televisions persuasive as to the issue here.

The record also contains the following definitions of "driver":

> Alan Freedman's Computer Glossary (9th ed.), Pl.'s Ex. 20
>> driver 2: a device that provides signals or electrical current to activate a transmission line or display screen
>
> The IEEE Standard Dictionary of Electrical and Electronics Terms (6th ed.), Pl.'s Ex. 20
>> driver 1: an electrical circuit that supplies input to another electronic circuit
>>
>> driver 2: (A) a software module that invokes and, perhaps, controls and monitors the execution of one or more other software modules. (B) A computer program that controls a peripheral device and, sometimes, reformats data for transfer to and from the device
>>
>> driver 3: a program, circuit or device used to power or control other programs, circuits or devices
>
> IBM Dictionary of Computing,  Def.'s Ex. H
>> driver 2: a system or device that enables a functional unit to operate
>>
>> driver 4:  a circuit that sends small electronic signals to a device
>
> Merriam-Webster's Collegiate Dictionary, Pl.'s Br. 21–22
>> driver 5a: the means for giving motion to a machine or machine part
>>
>> driver g: an electronic circuit that supplies input to another electronic circuit

These dictionary definitions demonstrate that "drive" means providing power to a device in order to turn it on or cause it to act.  "Driver" refers to an electrical device that supplies an input or electronic signal to another device in order to activate it.  In the context of computer software, a driver "perhaps" controls another software module and "sometimes" reforms the data.          Samsung argues that the defining characteristic of drive electronics is the inability to make independent judgments and change, manipulate, or create the image data contained within a signal.  None of the above definitions for "drive" or "driver" reference the inability to make independent judgments.  Furthermore, Samsung's own experts state that "drive" is a

generic term that can be applied to any undefined or unspecific electronic circuit.  Yang Report,

Pl.'s Ex. 7 at 20 ("[T]he term 'drive' as used in Electrical Engineering encompasses all

electronics and devices that are undefined and unspecific, making any attempts at defining the

term very difficult.").  Although Samsung's definition may be consistent with the function of

some drive electronics, the court will not limit the definition of drive electronics in a manner not

required by the common meaning.

    Thus, the court concludes that drive electronics supply a signal or electrical

current to another device in order to activate it or run it.

   2.  <u>Control Electronics</u>

    Samsung argues that control electronics are electronics that possess a "decision-

making" or "intelligent function" and can control "all aspects of the color television or video

image display[.]"  Pl.'s Br. 27; Pl.'s Reply 16.  Specifically, Samsung argues that control

electronics "create the instructions" used to control a television screen and that control

electronics have the ability to "judge or independently make decisions."  Pl.'s Br. 24–26.

    Defendant argues that the Court should extend <u>Skidmore</u> deference to Custom's

definition of control electronics as stated in the <u>Pioneer Ruling</u>.  Def.'s Br. 16–21.  The <u>Pioneer</u>

<u>Ruling</u> defined control electronics as the electronics that "manage the data (timing and order),

which is used to ultimately create an image on the display" and which "direct video signals and

timing instructions to the drive electronics."  <u>Pioneer Ruling</u> 5.  Samsung argues that if the court

adopts Customs' definition, the definition should be read to state that control electronics must

have the ability to accept "video signals," as opposed to Low Voltage Differential Signal

("LVDS") signals, and have the ability to "instruct, regulate, manage and supervise" those video

signals.  Pl.'s Br. 24–26; Pl.'s Reply 16; <u>see</u> <u>infra</u> n.28.

      The parties provide the following definitions of "control":

      <u>IBM Dictionary of Computing</u>,  Def.'s Ex. H; Pl.'s Ex. 20
          control 1: the determination of the time and order in which the parts of a data
          processing system and the devices that contain those parts perform the input,
          processing, storage, and output functions

      <u>McGraw-Hill Dictionary of Scientific and Technical Terms</u>, Def.'s Ex. S
          control 1: the section of a digital computer that carries out instructions in proper
          sequence, interprets each coded instruction, and applies the proper signals to the
          arithmetic unit and other parts in accordance with this interpretation

          control 2: a mathematical check used in some computer operations.  A means or
          device to direct and regulate a process or sequence of events

      <u>Oxford English Dictionary Online</u>, Def.'s Br. 17
          control: the fact of controlling, or of checking and directing action; the function or
          power of directing and regulating . . . .

          control (computing): that part of a computer which controls the operation of the
          other units and in recent computers interprets the coded instructions

The parties also provides the following definitions of "controller":

      <u>The Dictionary of Multimedia Terms & Acronyms</u> (1999 ed.), Def.'s Ex. G
          controller: in computer hardware, a processing component that manages the flow
          of data between the computer and peripheral devices.

      <u>IBM Dictionary of Computing</u>,  Def.'s Ex. H; Pl.'s Ex. 20
          controller: a device that coordinates and controls the operation of one or more
          input/output devices, such as workstations, and synchronizes the operation of
          such devices with the operation of the system as a whole.

      <u>The IEEE Standard Dictionary of Electrical and Electronics Terms</u> (6th ed.), Pl.'s Ex. 20.
          controller 2: a device or group of devices that serves to govern, in some
          predetermined manner, the electric power delivered to the apparatus to which it is
          connected

          controller 4: the component of a system that functions as the system controller.  A
          controller typically sends program messages to and receives response messages

from devices.

controller 5A: a functional unit in a computer system that controls one or more units of the peripheral equipment

controller 5C: a device through which one can introduce commands to a control system.

Webster's New International Dictionary, Def.'s Br. 17.
controller (electrical): any electric device for governing in some pre-determined way the power delivered to the apparatus

The definitions demonstrate that the term "control" refers to an electronic device or computer part that exercises "control" over another device or subsystem. This control function is described in various ways, including carrying out instructions in a proper sequence, interpreting coded instructions, determining the time and order of the device's actions, managing the flow of data, coordinating and synchronizing operations, governing the electrical power sent to the device, and accepting commands and carrying out instructions.

Samsung argues that the distinguishing characteristic of control electronics is the ability to make "independent decisions" and the ability to alter the information or instructions contained in the signal. See Answer to the Nine Questions: Answers Consolidated by Plasma TV Manufacturers ("Answers to the Nine Questions"), Pl.'s Ex. 14 (unpublished document prepared by seven plasma television manufacturers during a different customs dispute); Yang Report, Pl.'s Ex. 7 at 9, 26 (defining control electronics as possessing the ability to choose among various ways of processing information or have the ability to create and change signals). None of the above dictionary definitions specifically reference an ability to make independent judgments or decisions. Some of the definitions imply that control electronics have the ability to "determine" or "generate" a signal, although it is not specified whether this ability is a result of

independent judgments, as opposed to merely translating the signal into a new format.

Additionally, several definitions state that a controller merely acts according to pre-determined

instructions, demonstrating that a device does not need to "create" or "change" the information

in a signal to qualify as control.  See McGraw-Hill Dictionary of Scientific and Technical Terms,

Def.'s Ex. S (stating control "carries out instructions in proper sequence); The IEEE Standard

Dictionary of Electrical and Electronics Terms (6th ed.), Pl.'s Ex. 20 (stating a controller "serves

to govern, in some predetermined manner, the electrical power . . . ." ); Webster's New

International Dictionary, Def.'s Br. 17 (stating a controller is a "device for governing in some

pre-determined way the power delivered to the apparatus").  Accordingly, Samsung's expert

reports, which state that control electronics must be able to make independent judgments and

"create" the instructions, are not consistent with the dictionary definitions and are not entitled to

any persuasive weight.  See Kahrs Int'l, 791 F. Supp. 2d at 1240–41 (noting the court may

consider expert opinions as advisory and to the extent they are consistent with lexigraphic and

other reliable sources).

        Moreover, Samsung's own experts contradict the argument that all control

electronics must possess the ability to make independent decisions.  In Samsung's Answer to

Defendant's First Interrogatories, Samsung defined control electronics as "a system or electronic

circuits that uses a feedback function to make decisions by referring to such Feedback to reflect

an output status."  Pl.'s Answers to Def.'s First Interrogs. and Request for Production of Docs.

Directed to Pl. ("Pl.'s Answers to Def.'s First Interrogs."), Pl.'s Ex. 4 at 10, ¶ 12(a).  Samsung

noted that "Feedback is the determinative factor in distinguishing between Control Electronics

and Drive Electronics . . . ."  Id.  Samsung abandoned its argument that control electronics must

be able to receive feedback once its experts disagreed that feedback was a determinative element of the definition. See Deposition of Robert Marcotte ("Marcotte Dep."), Def.'s Ex. M at 104–05; see also Byungcho Choi Report ("Choi Report"), Pl.'s Ex. 10 at 9–11 (describing the difference between control systems with feedback and control systems without feedback).

As indicated, Samsung now argues that the ability to make "independent judgments" is the determining characteristic of control electronics. By independent judgments, Samsung appears to mean that an electronic device, based on the information it receives, can choose to act in various ways, instead of merely acting in the same way every time. See Yang Report, Pl.'s Ex. 7 at 26 (defining the decision-making function as taking input commands and reflecting upon the state and circumstances of the output or, in other words, the ability to process information in many ways based on feedback). "Independent decision-making" by an electronic device, therefore, refers to the device's ability to alter its functions based on the feedback it receives, instead of merely following a command. Thus, because "independent judgment" and "us[ing] a feedback function to make decisions" are different labels for the same activity, and because Samsung's own experts agree that feedback is not required for all control electronics, it follows that the ability to make independent judgments is not a requirement for all control electronics.

Samsung also argues that, consistent with the Pioneer Ruling, control electronics must be able to accept "video signals" from an external device. Pl.'s Br. 24; see also Choi Report, Pl.'s Ex. 10 at 9–10 (stating control electronics accept video signals from external devices (i.e. a cable signal) and send out an electronic signal and drive electronics are limited to receiving electrical signals). The dictionary definitions also do not reference the type of signal

as a distinguishing element of a control.  Instead, the dictionary definitions refer to the ability to

accept and process "commands," "instructions," "signals," and "power."  Thus, the court does

not find justification for reading into the common meaning of control electronics an ability to

create the signal, make independent judgments, or use only video signals.[21]

The court does not find that the Answer to the Nine Questions requires a

departure from the common meaning expressed by the dictionary definitions.  The document was

not published and was prepared by seven plasma television manufacturers in the context of a

specific customs dispute.  Additionally, the document contradicts itself by stating there is no

accepted or uniform definition of drive or control electronics before providing a specific

definition for both.  Answers to the Nine Questions ¶¶ 2, 3, 4(a)–(b) (noting there are no uniform

definitions of drive electronics in the flat panel display industry but defining drive electronics as

those that lack the ability to make independent judgments).[22]

---

[21] Samsung argues that if the court adopts the Pioneer Ruling's definition, it should be interpreted strictly to refer to the electronics that accept video signals.  Pl.'s Br. 24–26.  The court does not adopt the Pioneer definitions, and thus, this argument is moot.  Samsung's experts, however, do state that control electronics must accept video signals from an end-user system.  As stated above, this is inconsistent with the dictionary terms and is not persuasive.

[22] The Answers to the Nine Questions state that:

The television industry agrees that terms, such as 'controller', 'logic' and 'control electronics', 'drive electronics' are not uniformly used in the industry.  These terms are used differently and sometimes interchangeably by different Plasma TV Manufacturers.  They are not industry-defined technical terms.  They do not represent scientific or technical definitions of the product or industry.  In most cases these names and/or labels are used for convenience and certainly not necessarily for the purposes of describing or defining actual functions.

Answers to the Nine Questions ¶ 3.

Consistent with the common meaning as expressed in the dictionary definitions, the court concludes that control electronics are the electronics that perform some type of control function, such as interpreting coded instructions, determining the time and order of a device's actions, managing the flow of data, coordinating and synchronizing operations between two devices, governing the electrical power sent to a device, and accepting commands and carrying out instructions in a proper sequence.  Control electronics will perform some, although not necessarily all, of these types of functions.  Although some control electronics may use "independent judgment" or feedback, it is not a requirement for all control electronics.

The court's common definition of control electronics is confirmed by the expert reports in this case.  See Kahrs Int'l, 791 F. Supp. 2d at 1240–41 (noting the court may consider expert opinions to the extent they are consistent with lexigraphic and other reliable sources). Here, Defendant's experts state that the display industry defines control electronics as the electronics that process the signal from an input device and use that signal to turn on and off the drivers.  Schlam Declaration, Def.'s Ex. B at ¶ 10.

Samsung's experts also describe what is called an "open-loop control system," which refers to a device capable of controlling another subsystem without relying on feedback.[23]

---

[23]  In addition to the expert report, Samsung also provides dictionary definitions that demonstrate the difference between control systems with feedback and those without:

The IEEE Standard Dictionary of Electrical and Electronics Terms
controlling system 1: (automatic control system without feedback) That portion of the control system that manipulates the controlled system

controlling system 2: (control system feedback) The portion that compares functions of a directly controlled variable and a command and adjusts a manipulated variable as a function of the difference.

(continued...)

In an open-loop control system, an "input signal" is sent to a "controller," the controller converts the input signal into an "actuating signal" that is sent to another subsystem, the actuating signal causes the subsystem to function according to a pre-determined process, and that process produces the desired output.  See Choi Report, Pl.'s Ex. 10 at 12–13.  When discussing control theory, the expert report provides a general definition of "controlling function" as "transforming the input signal into the (intermediate) actuating signal that activates the rear-end subsystem to produce the output variable as the final outcome of the entire system."  Id. at 9–10.  This is consistent with the dictionary definitions in that control electronics accept a signal and process that signal in some way, such as translating the instructions in that signal and using the instructions to cause another subsystem or device to function.

        Having determined the common meaning of control and drive electronics, the court now turns to whether Samsung's PDP Modules contain a display device, drive electronics, and control electronics and thus, can be classified as FPSAs.

---

        [23](...continued)

Pl.'s Ex. 20.  This definition contradicts Samsung's argument that all control systems must have feedback.  It is undisputed that the PDP Module does not have feedback, and thus, the second definition is not relevant.  The non-feedback definition is consistent with the common definition that control electronics exert control over a device or system.

## II.     Classification of Samsung's PDP Modules

Here, the PDP Modules are prima facie classifiable in heading 8529 only.[24]  The

proper subheading at the six-digit level is 8529.90.[25]

### A.     V3 PDP Module

The proper classification at the eight-digit level turns on whether the Logic Board

meets the definition of control electronics.  Samsung argues that the Logic Board is not control

electronics because it has no capability to direct video signals or manage the data, and that its

only purpose is to energize and de-energizes the pixels on the display panel.  Pl.'s Br. 23, 29.

Samsung also argues that because the Logic Board cannot alter, manipulate, decide, or otherwise

affect the instructions sent to the display, it is not control electronics.  Pl.'s Br. 24, 29–30.

Defendant argues the Logic Board is control electronics because it directs video signals and

timing instructions to the Drivers and manages the data received from the Main Board (outside

the article at issue).  Def.'s Br. 23.

As defined above, a FPSA must contain at least a display device, drive

electronics, and control electronics.  Drive electronics supply a signal or electrical current to

---

[24]  The PDP Modules were used solely with televisions and video monitors and neither party has suggested that there is an alternative principal use.  Both parties argue that 8529 is the correct heading for the PDP Modules, which implies that the parties agree the PDP Module is primarily or solely used for articles of heading 8525 to 8528.  See Def.'s Facts ¶ 4; see also Pl.'s Br. 17 ("the heading that most closely describes the PDP Modules imported into Mexico from Korea is HTSUS 8529").  As a part suitable for use solely or principally with articles of heading 8528, the proper heading for the PDP Module is heading 8529.

[25]  Classification at the six digit level is readily determined.  The choice is between "Antennas and antenna reflectors of all kinds; parts suitable for use therewith" 8529.10 and "Other" 8529.90.  Because the PDP Module is not an antenna, 8529.90 would be the correct classification.

another device in order to activate it or run it.  Control electronics control a device or system by

performing some type of control function, such as such as interpreting coded instructions,

determining the time and order of a device's actions, managing the flow of data, coordinating

and synchronizing operations between devices, governing the electrical power sent to a device,

and accepting commands and carrying out instructions in a proper sequence.

The court finds that the glass panels containing the electrodes and plasma gas

constitute a display device because this is the plasma screen that will display the image.   The

court finds that the X, Y, and Column Drivers are the "drive electronics" because these

electronics provide an electrical signal to the electrodes in the panel in order to excite the

electrodes.[26]

The court finds that the Logic Board is a control electronic.  The Logic Board

executes a control function over the Drivers by receiving a signal from the Main Board,

processing that signal, and using the instructions and timing information contained in the signals

to know when and where to send the appropriate signals to the Drivers.  The Logic Board's

inability to create the instructions contained in the signal that it receives from the Main Board

and its inability to receive feedback and make adjustments to the signal are not determinative.

As explained above, the common meaning of "control" is not limited to electronics that generate

original instructions, make independent judgments, or accept feedback.  Instead, the

distinguishing characteristic is that control electronics control another device by performing a

control function such as interpreting coded instructions, determining the time and order of a

---

[26] The parties agree that the  X, Y, and Column Drivers are drive electronics.  Def.'s
Facts ¶ 7; Pl.'s Resp. ¶ 7.

device's actions, managing the flow of data, coordinating and synchronizing operations,

governing the electrical power sent to a device, and accepting commands and carrying out

instructions in a proper sequence.  Here, the Logic Board controls the X, Y, and Column Drivers

because it processes the LVDS signal received from the Main Board, performs coordinating and

synchronizing operations by interpreting the video information in accordance with the timing

information, performs the instructions contained in the signal in the proper sequence, and

manages the flow of data by sending the appropriate signal to the appropriate Driver at the

appropriate time.[27]

       The Logic Board also performs a drive function in that it takes a signal from the

Main Board and passes that signal along to the Drivers in order to energize the electrodes and

produce an image.  Additionally, the Main Board performs a control function by receiving a

signal, translating that signal into another format, and sending that signal to the Logic Board.

---

[27] The patents that relate to the V3 PDP Modules provide a schematic of the PDP
Module with one block labeled as a "controller".  See, e.g.,U.S. Patent 7,425,936 B2, Def.'s Ex.
V at 722; see also Deposition of Wansoon Kim, Def.'s Reply Ex.Y at 88 (identifying patent as
"related with V3").  The controller is described as receiving the image and synchronisation
signal from an outside source, dividing frames into sub-fields, and dividing the sub-fields into a
reset time, addressing time, and sustain/discharge time in order to drive the plasma display panel.
Id. at 735.  The functions of this controller are substantially similar to that of the Logic Board.
The schematic in the patent matches the block diagrams used by Samsung's expert to identify
control electronics.  See Choi Report, Pl.'s Ex. 10 at 13.  The patent shows that an "image
signal" is sent to the controller, the controller sends out electric signals to the drivers, and the
drivers produce an image on the screen.  Just as in the block diagram in the Choi Report, there is
a front-end subsystem (Logic Board), a rear-end subsystem (Drivers), an input variable (image
signal in LVDS format), an intermediate variable (electrical waveforms), and an output variable
(image).  Thus, the Logic Board fits the theoretical definition of control electronics provided by
Samsung's experts and illustrated in its patent.  Although Samsung's experts argue convincingly
that the Main Board can be identified as control electronics within an entire PDP television
system, Samsung's experts have not explained why the Logic Board cannot also be identified as
control electronics within a PDP Module.

Thus, it is easy for Samsung to argue that the Main Board constitutes control electronics and that

the Logic Board is merely a drive electronic that passes on a signal.  Samsung's experts note,

however, that electronics often will perform more than one function and that control electronics

can also preform a drive function.  Choi Report, Pl.'s Ex. 10 at 8 ("almost all components of

modern consumer electronics execute multiple functions simultaneously and interchangeably,

which may not always exclusively fall within one classification or another."); Yang Report, Pl.'s

Ex. 7 at 24 ("Similarly, a 'control electronics' also drives designated objects, just like a 'drive

electronics.'").  Thus, the ability of the Logic Board to pass a signal along to other devices,

which ultimately energizes the screen and displays an image, does not prevent the Logic Board

from qualifying as control electronics.

Additionally, the fact that the Main Board executes a control function does not

mean that the Logic Board cannot also execute a control function.  The Main Board accepts a

video signal and processes it into an LVDS format.  The Logic Board accepts an LVDS signal

and processes it into electrical waveforms.  Samsung argues that the process on the Main Board

is more complicated than the process on the Logic Board because the Main Board uses a

microprocessor and performs "image scaling and processing (enhance) functions."  See Kim

Deposition, Pl.'s Ex. 5 at 26.  Samsung's expert, however, describes both a complicated

controlled system, run by a microprocessor, and a simple controlled system that is not controlled

by a computer chip.  See Choi Report, Pl.'s Ex. 10 at 12–13 (quoting B.C. Kuo and F.

Golnarachi, Automatic Control Systems (8th ed., John Wiely & Sons, Hoboken, N.J. 2003) at

2–8 ("In simple cases, the controller can be an amplifier, a mechanical linkage, a filter, or other

control elements, depending on the nature of the system.  In more sophisticated cases, the

controller can be a computer such as a microprocessor.")).  Samsung's argument that only the

microprocessor on the Main Board could constitute control electronics is inconsistent with this

textbook definition of more simple controlled systems.  Samsung has not adequately explained

why a less complicated process of converting and generating an electrical waveform from an

LVDS input and using the instructions in the signal to control another subsystem (the Drivers) is

not also a control function.  In short, Samsung has emphasized the different functions performed

by the Main Board and the Logic Board, but Samsung has not demonstrated that the functions of

the Logic Board do not also satisfy the common definition of control electronics.

   Samsung's fundamental error is defining control electronics and drive electronics

in the context of a complete television.  See Pl.'s Reply 9, 29 (stating that control electronics

must "control the color video image" and that the NAFTA definition of control refers to all of

the control electronics in a television).  The court cannot consider these definitions in the context

of a complete television because it is defining a term that, by definition, must be merely a part of

a complete television.  Samsung's error is illustrated by its attempt to define control elections as

the electronic that accepts a video signal from the end-user system (i.e. a cable box or DVD

player).  It is undisputed that in the context of a complete television, the control electronics

include the electronics that accept a video signal from an end-user system.  See U.S. Customs,

Classification of Flat Panel Displays: An Informed Compliance Publication (Jan. 2004), Def.'s

Ex. K at 7 (defining control electronics in the context of a complete flat panel display (a

complete television) as "[i]ntegrated circuits that decode and interpret the signals sent by the

end-user system and transmit the signals to the drive electronics.").  This definition demonstrates

that the first electronic device connected to an end-user system is a type of control electronic.  It

does not follow, however, that the definition of control electronics is limited to the first

component of a televisions that accepts video signals from the end-user systems.[28]

Moreover, Samsung's proposed definition of control electronics would require

the court to find that a FPSA refers to: the Main Board and all of its integrated circuits, including

the analog board, digital board, microprocessor, and, in the case of a television, a tuner, plus all

of the integrated circuits on the Logic Board, the Drivers, and the flat panel display containing

the electrodes and plasma gas.[29]  Pl.'s Facts ¶¶ 34–35, 38; see Robert Marcotte Expert Report,

Pl.'s Resp. Ex. 5 at 24 (illustration of the control and drive electronics).  In short, Samsung

argues that a FPSA refers to a display panel plus all of the electronics necessary to produce an

image on the screen.  See Pl.'s Reply 29 (stating that the NAFTA Clarification did not refer to

only "some" of the control electronics but instead requires the "full set" of control electronics);

id. at 5 ("even if [the Logic Board] could be considered part of the control electronics, the full set

of control electronics is not present on the PDP Modules . . . .").  Such a definition would render

the NAFTA Clarification inconsistent with heading 8529, which only applies to "parts."

Samsung has failed to provide a definition for control electronics, as referenced by the NAFTA

---

[28]  Even if all control electronics were required to accept video signals, Samsung's argument would fail because Samsung itself describes the LVDS signal sent from the Main Board to the Logic Board as a "video signal."  See Pl.'s Answers to Def.'s First Interrog., Pl.'s Ex. 4 at 15, ¶ 24(a) (stating that the digital board enables the "Main Board to generate video signals (LVDS signals) delivered to the Logic Board . . . .").

[29]  The record suggests that this list would include all of the electronics necessary to make a television or video monitor.  See Pl.'s Facts ¶¶ 18, 31; Def.'s Resp. ¶¶ 18, 31 (stating that the PDP Modules are combined with the Main Board, front and rear covers, cables, and various connectors, fasteners, and other parts to produce the finished video monitors and televisions); See also Marcotte Dep., Def.'s Ex. M at 93–94 (stating that after the Main Board and Logic Board are combined, the remaining elements necessary to complete a television would be "final assembly-type items" such as remote control interfaces, outer bezels, and front EMI filters).

Clarification, that is plausible given the type of products that may be classified under

8529.90.53.                      The determinative issue here is whether the PDP Module contains

the electronics necessary to "control" the flat panel display, not the entire television.  The answer

here is yes because the Logic Board performs a control function by translating the video and

timing information, synchronizes the information, and uses the instructions from those signals to

know when to send a signal to a particular Driver.  Thus, the court finds that the V3 PDP Module

is classified under 8529.90.53 as a FPSA because it contains a display panel, drive electronics,

and control electronics.  Pursuant to the NAFTA ROO, the video and television monitors

incorporating the V3 PDP Module are therefore not NAFTA-originating goods and are not

entitled to NAFTA preferential treatment.

**B.      V4 PDP Module**

Samsung argues that because the V4 PDP Module was not imported with a Logic

Board attached, the Module cannot have control electronics and therefore is not a FPSA.  Pl.'s

Br. 29.  Defendant argues the V4 Modules were imported together with the Logic Boards, and

thus, are unassembled FPSAs pursuant to GRI 2(a).  Def.'s Br. 26.  Samsung replies that the

products cannot be classified as FPSAs under GRI 2(a) because (1) complex manufacturing

processes are required to manufacture and assemble the V4 Logic Board to the V4 PDP Module;

(2) the Logic Board is not control electronics, and (3) even with the Logic Board assembled on

the V4 at the time of importation, the V4 has yet to be designated for use in a television versus

computer monitor and thus, cannot be classified as a FPSA.[30]  Pl.'s Reply 25.

_____

[30]  Flat plasma screens used for computer systems are prima facie classifiable in heading
8471(for use in ADP systems) and not in 8529.

GRI 2(a) states that "Any reference in a heading to an article shall be taken to include a reference . . . to that article complete or finished . . . entered unassembled or disassembled." GRI 2(a); see also Explanatory Note V to GRI 2(a) ("[C]omplete or finished articles presented unassembled or disassembled are to be classified in the same heading as the assembled article."). The Explanatory Notes explain that "'articles presented unassembled or disassembled' means articles the components of which are to be assembled either by means of fixing devices (screws, nuts, bolts, etc.) or by riveting or welding, for example, provided only assembly operations are involved. No account is to be taken in that regard of the complexity of the assembly method." Explanatory Note VII to GRI 2(a). "However, the components shall not be subjected to any further working operation for completion into the finished state." Id.

The Explanatory Notes and case law from the court do not elaborate on the distinction between "assembly operations" and "further working operation." Customs, when resolving this issue, first considers whether the items were imported together in the same shipment in equal amounts or whether the items were imported in bulk for an assembly operation. See Re: Classification of Plastic Pet Carrier Parts; Not incomplete articles with essential character of complete or finished container: GRI 2(a), HQ Ruling 966894 (Mar. 2004). The former will be considered finished items entered unassembled, and the latter are classified as discrete products. See RE: Protest No. 4909-91-100143; Footwear; Leather Upper; Sock Liner; Constructively Assembled; Goods Shipped in Bulk, HQ 951508 (July 1992).

Here, it is undisputed that the Logic Board and V4 PDP Modules applicable to the entries at issue were included in the same shipment and were listed together in equal numbers on the entry documentation. Def.'s Facts ¶ 34; Pl.'s Resp. ¶ 34; see also Pl.'s Third Supplemental

Answer to Def.'s First Interrog. and Req. for Produc. of Docs. Directed to Pl., Def.'s Ex. 1,

(entry documentation listing V4 PDP Modules and Logic Boards in equal numbers).[31]

Additionally, there is no dispute that the Logic Board is a part that is to be fitted together with

the V4 PDP Module. See Pl.'s Facts ¶¶ 18–19. Thus, classification turns on whether the Logic

Board is attached to the PDP Module with only assembly operations.

Samsung repeatedly describes the process of connecting the V4 Logic Board to

the PDP Module as mounting and assembly.[32] See Pl.'s Facts ¶ 18 (quoting Pl.'s Answer to

Def.'s First Interrogs., Pl.'s Ex. 4 at 13, ¶ 18) ("In the case of the V4 modules, the V4 Logic

Board, which is not included on the PDP Logic Board when shipped from Korea, is assembled

and mounted onto the V4 PDP Module in Mexico during this time."); see also Pl.'s Answer to

Def.'s First Interrogs., Pl.'s Ex. 4 at 13, ¶ 19 ("in the case of the V4 PDP Module, the Logic

Board is assembled onto the PDP Module after its importation into Mexico").

Samsung relies on a declaration of one of its executives, Wansoo Kim, to

demonstrate that further manufacturing is required to attach the Logic Board to the V4 PDP

---

[31] [[



]] The
entry documentation provided by Samsung was in response for a request for all entry
documentation related to the entries at issue. See Def.'s Ex. 1 at 7. If there were other
shipments of the V4 PDP Module that did not include the V4 Logic Board, Samsung had the
opportunity to provide them but did not. Thus, Samsung offers no evidence to suggest other
shipments did not include the V4 Logic Boards and PDP Modules together.

[32] In general, logic boards are attached with special wire-harnesses used as connectors.
See Answers to the Nine Questions at 20, ¶ 6.

*Confidential Information Deleted*

Module. Declaration of Wansoo Kim, Pl.'s Resp. Confidential Ex. 1, ¶¶ 3, 6, 9. Contrary to

Samsung's arguments, the statements in Kim's Declaration further demonstrate that the Logic

Board is merely mounted and attached to the Main Board. Id. ¶ 9.[33] Although additional

manufacturing occurs in Mexico to transform the PDP Module into a finished product, the Kim

Declaration does not state that the further manufacturing is related to the connection of the Logic

Board to the PDP Module. See id. ¶ 6.[34] Thus, Samsung has offered no evidence of the alleged

manufacturing and its own Statement of Undisputed Facts describes the process as one of

mounting and assembly.

          Samsung's remaining arguments are also unavailing. Samsung supplied only

limited evidence relating to the structure and function of the V4 Logic Board. It, therefore, has

failed to present evidence that the V4 Logic Board lacks control electronics. Regardless, by

Samsung's own admission, the Logic Board for the V4 Module contains control electronics.

Pl.'s Answers to Def.'s First Interrogs., Pl.'s Ex. 4 at ¶ 40 (stating that the MICOM on the V4

Logic Board provides the "control" function).[35]

---

[33]   The relevant portion of paragraph 9 (II)(3) states: [[

                                                                                    ]]

[34]   Paragraph 6 states in part: [[



                            ]]

[35]   Unlike the V3 Logic Board, the V4 Logic Board incorporated a MICOM as an
additional integrated circuit. Yang Report, Pl.'s Ex. 7 at 6, Table 1. "The MICOM, an IC, is a
small computer containing a software program through which it can make decisions. It has input
ports for various purposes including receiving feedback." Pl.'s Answers to Def.'s First

(continued...)

*Confidential Information Deleted*

Finally, even though the PDP Modules may lack the electronics that eventually designate it for use in a television versus an ADP system, Samsung has not argued that there is an alternative principal use for its PDP Modules.  Because headings 8529 (parts used for television and video monitors) and 8471 (ADP systems) are "use" provisions, the principal use of the PDP Modules controls, regardless of whether the products could potentially be used in other systems.

The court concludes that Samsung's V4 PDP Module and Logic Board are classified as an unassembled FPSA under subheading 8539.90.53 and are, therefore, not entitled to preferential NAFTA treatment.

---

[35](...continued)
Interrogs., Pl.'s Ex. 4 at ¶ 41(a).  Thus, according to Samsung, the V4 Logic Board constitutes control electronics.

Court No. 10-00015                                                                    Page 36

## CONCLUSION

For the foregoing reasons, the court concludes that the V3 and V4 PDP Modules are flat-panel screen assemblies classified under 8529.90.53, HTSUS.  Because the imported goods include a FPSA manufactured outside of a NAFTA territory, the NAFTA Rules of Origin have not been satisfied and the imported goods are not entitled to NAFTA preferential treatment. The court sustains Commerce's denial of Samsung's request and application for NAFTA preferential treatment and the denial of the subsequent protests on all entries covered by this case.  Plaintiff's motion for summary judgment is denied.  Defendant's motion for summary judgment is granted.  Judgment will be entered accordingly.

                                                           /s/ Jane A. Restani
                                                          Jane A. Restani
                                                               Judge

Dated:  This 21st day of November, 2012
          New York, New York

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **SAMSUNG INTERNATIONAL, INC.,** | |
| Plaintiff, | |
| v. | **Before: Jane A. Restani, Judge** |
| **UNITED STATES,** | **Court No. 10-00015** |
| Defendant. | |

## JUDGMENT

This case having been duly submitted for decision; and the court, after due deliberation, having rendered a decision herein; Now therefore, in conformity with said decision it is hereby

ORDERED, ADJUDGED and DECREED that Defendant United States' Cross-Motion for Summary Judgment is granted and Plaintiff Samsung International, Inc.'s Motion for Summary Judgment is denied. Customs' denial of the requests for NAFTA post-importation duty refunds is sustained. Judgment is awarded to Defendant United States with costs.

Dated this 21st day of November, 2012.
New York, New York

　　　　　　　　　　　　　　　 /s/ Jane A. Restani
　　　　　　　　　　　　　　　　Jane A. Restani
　　　　　　　　　　　　　　　　　　Judge